

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY 2013 GRAND JURY
DECEMBER 16, 2014 SESSION

UNITED STATES OF AMERICA

v.                          CRIMINAL NO. 2:14-00264

33 U.S.C. §  1319(c)(1)(A)
33 U.S.C. §§ 1311, 1318
33 U.S.C. §§ 407, 411
DENNIS P. FARRELL           18 U.S.C. §  157(3)
WILLIAM E. TIS              18 U.S.C. §  1343
CHARLES E. HERZING          18 U.S.C. §  157(2)
GARY L. SOUTHERN            18 U.S.C. §  152(2)
                            18 U.S.C. §  2


I N D I C T M E N T


The Grand Jury charges:

## COUNT ONE
### (Negligent Discharge of a Pollutant)

### BACKGROUND

At all times relevant to this Indictment, unless otherwise
specified:

### Freedom Industries and the Defendants

1.  Freedom Industries, Inc. ("Freedom") was a West Virginia
corporation located in Charleston, West Virginia, and engaged,
directly and through two closely-affiliated companies, in the
business of storing, selling, and transporting chemicals that
were used in various industries, including the coal-mining

1

industry. The two affiliated entities were Etowah River Terminal, LLC ("Etowah River LLC") and Poca Blending, LLC ("Poca Blending"). Freedom owned Poca Blending, which operated a chemical storage and processing plant in Nitro, West Virginia (the "Poca Facility").

2. Freedom was owned by defendants DENNIS P. FARRELL, WILLIAM E. TIS, and CHARLES E. HERZING until December 6, 2013, when they sold their shares of Freedom to a Pennsylvania corporation, Chemstream Holdings, Inc. ("Chemstream").

3. From a date no later than October 2001 through approximately December 6, 2013, FARRELL served as the president of Freedom. From no later than 2004 through approximately December 6, 2013, TIS served as the secretary of Freedom, and HERZING served as the vice-president of Freedom. FARRELL, TIS, and HERZING also served on Freedom's board of directors.

4. FARRELL, TIS, and HERZING formed Etowah River LLC in approximately September 2001, to purchase and operate an above-ground storage-tank facility located at 1015 Barlow Drive, Charleston, West Virginia (the "Etowah Facility"), on the east bank of the Elk River. FARRELL, TIS, and HERZING were the "members" of Etowah River LLC until December 6, 2013, when they sold their interests, that is, their membership units, to

2

Chemstream. Chemstream agreed to pay approximately $20 million for Freedom and Etowah River LLC.

5.  Etowah River LLC was operated on behalf of and with the intent to benefit Freedom. (Hereinafter, all references to Freedom will include Etowah River LLC.)

6.  After December 6, 2013, FARRELL continued to work at the Etowah Facility in a management role and described himself occasionally as Freedom's president.

7.  In or about May 2009, defendant GARY L. SOUTHERN began serving as Freedom's Chief Operating Officer. From March 17, 2010, through October 10, 2013, SOUTHERN also served on Freedom's board of directors. SOUTHERN became Freedom's president in late December 2013, after Chemstream purchased Freedom.

8.  In their respective capacities as officers, directors, managers, and supervisors of Freedom, defendants FARRELL, TIS, HERZING, and SOUTHERN were "responsible corporate officers" of Freedom, exercising authority over the operation and management of Freedom and the Etowah Facility.

9.  Freedom used the Etowah Facility to store and process chemicals and other substances, including a chemical that was used in the coal-mining industry as a cleansing agent and which consisted primarily of the chemical 4-methylcyclohexane

methanol. That substance, both in the form as Freedom originally purchased it, and in the form after Freedom processed it, was commonly referred to (and will be referred to hereinafter) as "MCHM."

The MCHM Spill Into the Elk River

10. In the morning of January 9, 2014, it was discovered that MCHM stored at the Etowah Facility had leaked from Tank 396 into a containment area.

11. A significant quantity of the leaked MCHM breached containment, including a dike wall, ran down the riverbank and discharged into the Elk River via at least two discernible, confined, and discrete channels or fissures. The MCHM then flowed downstream.

12. A water treatment and distribution plant of the West Virginia American Water Company (the "Water Company"), and an intake for that plant, were located approximately 1 – 1 1/2 miles downstream from the Etowah Facility on the Elk River. Through the intake, the Water Company took in water from the Elk River and treated it to supply water for residents and businesses in Charleston and surrounding areas.

13. The MCHM from the Etowah Facility flowed into the Water Company's intake and treatment plant on the Elk River on January 9, 2014. As a result, at approximately 6:00 p.m. on January 9,

4

2014, the State of West Virginia issued a "do not use" advisory, which effectively denied water from the Water Company, for drinking, cooking and washing. The advisory covered an estimated 300,000 residents within a nine-county area for several days.

<u>The Clean Water Act and the NPDES Program</u>

14.  The Federal Water Pollution Control Act, commonly known as the Clean Water Act, codified at Title 33, United States Code, Sections 1251—1387, was enacted by Congress to restore and maintain the integrity of the Nation's waters and to prevent, reduce, and eliminate water pollution.

15.  The Clean Water Act prohibited the discharge of any pollutant into waters of the United States by any person, except in compliance with a permit issued under the National Pollutant Discharge Elimination System ("NPDES") by the United States Environmental Protection Agency ("EPA") or an authorized state.

16.  The Clean Water Act contained the following definitions:

- A "person" was an individual or corporation, 33 U.S.C. § 1362(5), and "any responsible corporate officer," 33 U.S.C. § 1319(c)(6);

- The "discharge of a pollutant" was the addition of any pollutant to navigable waters, from any point source, 33 U.S.C. § 1362(12);

- A "point source" was any discernible, confined and discrete conveyance from which pollutants are discharged, for example a pipe, ditch, channel, conduit or discrete fissure, 33 U.S.C. § 1362(14); and

- A "pollutant" was, among other things, solid waste, chemical waste, and industrial waste discharged into water, 33 U.S.C. § 1362(6).

17.   At all places relevant to this Indictment, the Elk River was a navigable water of the United States within the meaning of the Clean Water Act, 33 U.S.C. § 1362(7) and 40 C.F.R. § 122.2.

18.   The EPA delegated the National Pollutant Discharge Elimination System program to the State of West Virginia in May 1982, see 47 Fed. Reg. 22,363 (May 24, 1982). Thereafter, and at all relevant times, the program in West Virginia was administered by the West Virginia Department of Environmental Protection ("DEP"), subject to oversight by the EPA.

19.   Pursuant to the delegation of authority, the DEP issued a "Multi-Sector General Water Pollution Control Permit," No. WV0111457 (the "Permit"), under which industrial facilities, such as Freedom, could apply for individual registration and authority to operate. The Permit authorized permit holders to discharge storm water into navigable waters, subject to monitoring and reporting requirements for certain pollutants, but did not allow for the discharge of MCHM.

6

20. Freedom operated the Etowah Facility pursuant to the Permit, under General Permit Registration Number WVG610920. Freedom did not have any permit allowing for the discharge of MCHM into the Elk River.

## NEGLIGENT OPERATION OF THE ETOWAH FACILITY

21. At all times pertinent to this Indictment, Freedom and its officers and agents, including responsible corporate officers, failed to exercise reasonable care in its duty to operate the Etowah Facility in a safe and environmentally-sound manner, in that it failed to comply with applicable law, regulations, and guidelines; failed to follow its own internal operating procedures; and failed to conform to common industry standards for safety and environmental compliance. Freedom's failure to exercise reasonable care was a proximate cause of the unpermitted discharge of the pollutant MCHM into the Elk River. Freedom thus negligently discharged the pollutant MCHM into the Elk River, in violation of 33 U.S.C. §§ 1319(c)(1)(A) and 1311.

22. At relevant times, and as responsible corporate officers for Freedom, FARRELL, TIS, HERZING, and SOUTHERN failed to exercise their authority to ensure that Freedom operated the Etowah Facility in a reasonable and environmentally-sound manner, when they knew or should have known of the facts and circumstances constituting Freedom's negligence.

7

23.  Freedom's negligence included, but was not limited to:

- Freedom failed to properly maintain the containment area surrounding the tanks at the Etowah Facility, and to make necessary repairs, including to the dike wall, to ensure that the containment area would actually contain a chemical spill.

- Freedom failed to properly inspect Tank 396.

- Freedom failed to adequately train its personnel on pollution prevention.

- Freedom failed to have adequate spill-prevention equipment and supplies on hand at the Etowah Facility.

- Freedom failed to develop and implement a spill prevention, control and countermeasures ("SPCC") plan, which was required at the Etowah Facility because Freedom stored mineral oil, fatty acids, and diesel fuel there, in sufficient quantities to require an SPCC plan.

- Freedom failed to develop and implement a stormwater pollution prevention plan and a groundwater protection plan, both of which were required by the NPDES Permit.

24.  During the time that they were responsible corporate officers for Freedom, FARRELL, TIS, HERZING, and SOUTHERN approved funding only for those projects that would result in increased business revenue for Freedom or that were necessary to make immediate repairs to equipment that was broken or about to break. And, in one particular instance, FARRELL, TIS, HERZING, and SOUTHERN authorized the development of an SPCC for the Poca

Facility, and approved funding for certain repairs to implement the SPCC, but only after the EPA had made an unannounced visit to the Poca Facility and had expressly advised Freedom that an SPCC was necessary there.

25. During the time that they were responsible corporate officers for Freedom, FARRELL, TIS, HERZING, and SOUTHERN ignored and/or failed to take any action to fund other projects for repair and upkeep of, and improvements to, equipment and systems necessary for environmental compliance at the Etowah Facility, including, for example, repairing defects in the dike wall, addressing drainage problems in the containment area, and developing and implementing an SPCC, a stormwater pollution prevention plan, and a groundwater protection plan for the Etowah Facility.

26. During the time that SOUTHERN was a responsible corporate officer for Freedom, and while Freedom, SOUTHERN and the other responsible corporate officers failed to make repairs, upgrades, and improvements to equipment and systems necessary for environmental compliance, SOUTHERN profited from the sale of goods to Freedom by companies that SOUTHERN owned or in which he had a substantial interest. These companies included IWL, Inc., which SOUTHERN wholly owned; Blackwater Group LLC, which was owned by Southern Investment Trust, of which SOUTHERN

9

was the trustee; and Enviromine, Inc., of which SOUTHERN owned 85% until October 2013 when Chemstream purchased Enviromine, Inc. for $11.5 million.

## CRIMINAL VIOLATION OF THE CLEAN WATER ACT

27. During the time period extending from at least approximately February 2002 through on or about January 9, 2014, as specified below for each defendant, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendants DENNIS P. FARRELL, WILLIAM E. TIS, CHARLES E. HERZING, and GARY L. SOUTHERN failed to meet a reasonable standard of care as responsible corporate officers for Freedom, by not exercising their authority to ensure that Freedom operated the Etowah Facility in a reasonable and environmentally-sound manner, as detailed above.

28. Their negligence resulted in and caused the discharge of a pollutant, that is, MCHM, from point sources into the Elk River, a navigable water of the United States, from on or about January 9, 2014, through at least January 23, 2014, without a permit issued under Title 33 of the United States Code authorizing such discharge.

29. The time periods during which each defendant was a responsible corporate officer of Freedom who failed to exercise his authority as described above, and is therefore criminally

responsible for the discharge of MCHM into the Elk River, are as follows:

      a. Defendant FARRELL – from approximately February 2002 through on or about January 9, 2014;

      b. Defendant TIS – from no later than 2004 through at least December 6, 2013;

      c. Defendant HERZING – from no later than 2004 through at least December 6, 2013; and

      d. Defendant SOUTHERN – from approximately May 2009 through on or about January 9, 2014.

In violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1311.

11

COUNT TWO
(Unlawful Discharge of Refuse Matter)

1.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 26 of Count One of this Indictment as if fully set forth herein.

2.  During the time period extending from at least approximately February 2002 through on or about January 9, 2014, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendants DENNIS P. FARRELL, WILLIAM E. TIS, CHARLES E. HERZING, and GARY L. SOUTHERN caused to be discharged and deposited, from the shore, certain refuse matter, that is, MCHM, into the Elk River, a navigable water of the United States, without a permit authorizing such discharge and deposit.

3.  The discharge and deposit of MCHM began no later than January 9, 2014, and continued through at least January 23, 2014.

In violation of Title 33, United States Code, Sections 407 and 411.

**COUNT THREE**
**(Negligent Violation of Permit Condition)**

1.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 26 of Count One of this Indictment as if fully set forth herein.

2.    During the time period extending from approximately February 2002 until on or about January 9, 2014, as specified below for each defendant, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendants DENNIS P. FARRELL, WILLIAM E. TIS, CHARLES E. HERZING, and GARY L. SOUTHERN, as responsible corporate officers of Freedom, negligently violated a permit condition implementing sections of the Clean Water Act (33 U.S.C. §§ 1311 and 1318), in a permit issued by the State of West Virginia under 33 U.S.C. § 1342, that is, National Pollution Discharge Elimination System Permit No. WV0111457, General Permit Registration Number WVG610920 (the "Permit"), by failing to develop, maintain, and implement a Stormwater Pollution Prevention Plan ("Plan") for the Etowah Facility as required by the Permit and consequently by failing to implement reasonable practices, that is, "stormwater management controls," that should have been included in any such Plan.

3.   The  time  periods  during  which  each  defendant  was  a responsible  corporate  officer  of  Freedom  who  negligently violated a permit condition as described above are as follows:

- Defendant FARRELL - from approximately February 2002 through on or about January 9, 2014;

- Defendant TIS - from no later than 2004 through at least December 6, 2013;

- Defendant HERZING - from no later than 2004 through at least December 6, 2013; and

- Defendant SOUTHERN – from approximately May 2009 through on or about January 9, 2014.

In  violation  of  Title  33,  United  States  Code,  Sections 1319(c)(1)(A), 1311, and 1318.

COUNTS FOUR - EIGHT
(Scheme to Defraud in Bankruptcy Case)

1.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 26 of Count One of this Indictment as if fully set forth herein.

Aftermath of the MCHM Discharge: Lawsuits and Bankruptcy

2.  Numerous lawsuits were filed against Freedom as a result of the discharge of MCHM into the Elk River, and the subsequent denial of water from the Water Company for most uses. The first such lawsuit was filed on the morning of January 10, 2014.

3.  On January 17, 2014, as a result of the numerous lawsuits against Freedom, and faced with the loss and potential loss of business and revenue, Freedom sought protection in bankruptcy by filing a voluntary petition for relief under Chapter 11 of Title 11, United States Code, that is, the Bankruptcy Code.

4.  Defendant GARY L. SOUTHERN was also sued individually as a result of the MCHM discharge and subsequent denial of water. The first suit against SOUTHERN was filed on January 13, 2014, in the United States District Court in Charleston, West Virginia. (The individuals and entities who sued SOUTHERN will be referred to hereinafter as the "Plaintiffs.")

15

## The Bankruptcy Process

5.   The United States Bankruptcy Code exists to assist debtors with getting a fresh start. The bankruptcy laws provide debtors with the opportunity either to reorganize and pay their debts while keeping their property or business, or to liquidate their assets under the bankruptcy court's supervision.

6.   A debtor is a person or entity that has filed a petition for relief in bankruptcy.

7.   In a bankruptcy case, the debtor must file "schedules" and a statement of financial affairs, to provide information about the debtor's finances, assets, and liabilities. Also, the bankruptcy court typically holds a hearing immediately after the bankruptcy case begins, to review initial motions and questions about the debtor's organization and finances. That hearing is commonly referred to as the "first-day hearing."

8.   A bankruptcy case may involve a large number of creditors, that is, persons and entities who hold or who have asserted a claim against the debtor. The creditors may include those who hold a security interest, such as a lien or mortgage, in some of debtor's property. The creditors also may include those who have claims with no security or priority. The latter are known as "unsecured creditors," and it is common for the

16

bankruptcy court to appoint a committee to represent all unsecured creditors.

9. A bankruptcy case typically involves a hearing known as a "meeting of creditors," at which a debtor or officers of a debtor will testify under oath. Creditors have the opportunity to ask questions about the debtor's assets and liabilities at the meeting of creditors.

### Freedom's Bankruptcy Case

10. Freedom filed its bankruptcy petition on January 17, 2014. Freedom's initial intent was to reorganize and then to continue operations as an ongoing business concern. In a bankruptcy hearing on February 21, 2014, however, Freedom indicated its intent to wind up its affairs and no longer attempt to reorganize as a going concern.

11. The first-day hearing in Freedom's case was held on January 21, 2014, in Charleston, West Virginia. The purposes of that first-day hearing included determining who had been responsible for the management, operations and recordkeeping of Freedom in the years and months leading up to the initiation of Freedom's bankruptcy case on January 17, 2014, and establishing a basis for an informed judgment as to who should be entrusted with running Freedom as its bankruptcy case proceeded.

12. As president of Freedom, SOUTHERN testified under oath at the first-day hearing about, among other things, whether he worked for or was otherwise affiliated with Freedom before Chemstream purchased Freedom on December 6, 2013, and whether he was involved with Chemstream's purchase of Freedom.

13. Freedom's bankruptcy case involved a large number of creditors, including unsecured creditors. The creditors of Freedom include some or all of those who had filed a lawsuit against Freedom and also some or all of those who sued SOUTHERN, that is, the Plaintiffs. As of December 8, 2014, over 3000 creditors had filed claims against Freedom, which totaled over $176,000,000.

14. The Bankruptcy Court appointed a Committee of Unsecured Creditors (the "Committee") on February 5, 2014.

15. One of the purposes of the Committee was to ensure that funds were maximized and available for distribution to all unsecured creditors. A critical part of the Committee's purpose included investigating the discharge of the MCHM into the Elk River and determining if there were any legal causes of action that should be pursued on behalf of the unsecured creditors. Such causes of action might include lawsuits against former and current officers, directors, and employees.

16.   The meeting of creditors in Freedom's case was held on February 25, 2014, in Charleston, West Virginia.   The purposes of the meeting of creditors included reviewing the assets and liabilities of Freedom. It was also a purpose of the meeting of creditors to explore issues that might affect those assets and liabilities, including issues that might help determine whether there were any potential claims that could be brought against other parties on behalf of the debtor, that is, Freedom, or on behalf of Freedom's creditors.

17. SOUTHERN   testified   under   oath   at   the   meeting   of creditors, answering questions about, among other things, his role with Freedom before Chemstream purchased the shares of Freedom on December 6, 2013, including whether he had been a part of Freedom's organization and whether he had played a role in purchasing insurance for Freedom.

<u>The Scheme to Defraud</u>

18.   From   at   least   January   21,   2014,   through   at   least December 8, 2014, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendant GARY L. SOUTHERN did knowingly devise and intend to devise a scheme to defraud Freedom's creditors and the Plaintiffs, by misrepresenting and concealing material facts

19

about his role and duties with Freedom before he assumed the duties as president of Freedom in late-December 2013.

## The Purposes of the Scheme to Defraud

19.  SOUTHERN's purposes in the scheme to defraud included: to forestall and defeat lawsuits that had been or might be filed against him, and to evade claims of Freedom's creditors and the imposition of legal judgments against him, to the ultimate end of retaining, preserving and protecting his assets and net worth. As of the fall of 2014, SOUTHERN possessed assets that exceeded $7 million.

20.  SOUTHERN intended to accomplish these purposes by, among other things, deceiving creditors of Freedom, the Plaintiffs, the Bankruptcy Court, and government officials, into believing that he was not part of the Freedom organization before the purchase of Freedom by Chemstream; had been affiliated with Freedom for only a short period of time before the discharge of MCHM was discovered on January 9, 2014; and was not responsible for and should not be held legally liable for the MCHM discharge and resulting injuries and damages.

21.  In fact, SOUTHERN had worked for Freedom as its Chief Operating Officer beginning in approximately May 2009, and had served on Freedom's board of directors from March 2010 until October 2013. As the Chief Operating Officer, SOUTHERN managed

Freedom's business affairs and operations at the Etowah Facility and the Poca Facility, exercised authority in hiring employees and executing contracts, authorized spending, presided over staff meetings, and supervised employees, among other things. Moreover, as a responsible corporate officer of Freedom, SOUTHERN was responsible for Freedom's negligence, which proximately caused the discharge of MCHM into the Elk River, in that SOUTHERN failed to exercise his authority to ensure that Freedom operated the Etowah Facility in a reasonable and environmentally-sound manner.

<u>Manner and Means for Carrying Out the Scheme to Defraud</u>

22.  It was a part of the scheme to defraud that on January 21, 2014, SOUTHERN falsely and fraudulently testified under oath before the United States Bankruptcy Court at the first-day hearing about his role with Freedom before Chemstream purchased Freedom in December 2013, and his role in the purchase itself.

23.  It was further a part of the scheme to defraud that on or about February 7, 2014, SOUTHERN transferred $6.5 million from his account with Wells Fargo Bank, N.A., by arranging for a check for $6.5 million to be mailed to an annuity account with Jackson National Life Insurance Company, at least in part for "annuity creditor protection."

24.  It was further a part of the scheme to defraud that on February 19, 2014, SOUTHERN made fraudulent representations and omissions to officials with the Occupational Safety and Health Administration about SOUTHERN's role with Freedom before Chemstream purchased Freedom's shares and about his knowledge of the condition of the dike wall enclosing the containment area in the Etowah Facility.

25.  It was further a part of the scheme to defraud that on February 25, 2014, SOUTHERN falsely and fraudulently testified under oath at the meeting of creditors about his role with Freedom before Chemstream purchased Freedom's shares in December 2013, including whether he had been a part of Freedom's organization, and whether he had played a role in purchasing insurance for Freedom.

26.  It was further a part of the scheme to defraud that on March 15, 2014, SOUTHERN caused to be filed in the Bankruptcy Court an application for an order to allow for payment to him and a claim for indemnification (the "Application"). In the Application, SOUTHERN provided limited background information about his becoming president of Freedom, but he omitted the material facts that he had served as Freedom's Chief Operating Officer beginning in May 2009 and had served as a director of Freedom from March 2010 until October 2013.

22

27.  It was further a part of the scheme to defraud that on April 4, 2014, SOUTHERN caused to be filed a notice to withdraw the Application, in which he fraudulently indicated that he had no role with Freedom before taking over as president and, therefore, was not responsible for the MCHM discharge.

Executing the Scheme to Defraud By False and
Fraudulent Representations In Freedom's Bankruptcy Case

28.  On or about the dates indicated below, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, and elsewhere, having devised and intending to devise the above-described scheme to defraud, and for the purpose of executing such scheme and attempting to do so, defendant GARY L. SOUTHERN knowingly made a false and fraudulent representation concerning and in relation to a proceeding under Title 11 of the United States Code, after the filing of the petition, as described below for each count.

| Count | Date | False and Fraudulent Representation in Freedom's Bankruptcy Case |
|---|---|---|
| 4 | 1/21/2014 | At the first-day hearing, SOUTHERN testified that he did not work for Freedom before the purchase of Freedom by Chemstream and had merely been a "part-time, financial type consultant" there. |
| 5 | 1/21/2014 | At the first-day hearing, SOUTHERN testified that he was involved |

23

|   |           |                                                                                                                                                                 |
|---|-----------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------|
|   |           | "superficially" in the purchase of Freedom by Chemstream.                                                                                                        |
| 6 | 2/25/2014 | At the meeting of creditors, SOUTHERN testified that he was not "a part of the Freedom organization" before the purchase of Freedom by Chemstream.                |
| 7 | 2/25/2014 | At the meeting of creditors, SOUTHERN testified that he had been a consultant to Freedom for "sales, marketing, back office" purposes, before the purchase of Freedom by Chemstream. |
| 8 | 2/25/2014 | At the meeting of creditors, SOUTHERN testified that he had not been involved with the procurement of insurance policies for Freedom, before the purchase of Freedom by Chemstream. |

All in violation of Title 18, United States Code, Section 157(3).

## COUNT NINE
### (Scheme to Defraud by Wire)

1.      The   Grand   Jury   re-alleges   and   incorporates   by reference paragraphs 1 through 27 of Count Four of this Indictment as if fully set forth herein.

<u>Executing the Scheme to Defraud By Interstate Wire</u>

2.      On or about January 28, 2014, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, and elsewhere, having devised and intending to devise the above-described scheme to defraud, and for the purpose of executing such scheme, defendant GARY L. SOUTHERN knowingly   caused   to   be   transmitted   by   means   of   wire communication in interstate commerce, certain writings, signs, and signals, that is, an electronic mail sent to SOUTHERN by his financial advisor, in which the financial advisor provided information,   pursuant   to   prior   conversations,   about   the protection of assets under Florida law from anticipated creditor claims.

In violation of Title 18, United States Code, Section 1343.

25

**COUNT TEN**
**(Scheme to Defraud in Bankruptcy Case)**

1.    The   Grand   Jury   re-alleges   and   incorporates   by
reference  paragraphs  1  through  27  of  Count  Four  of  this
Indictment as if fully set forth herein.

<u>Executing the Scheme to Defraud By Interstate Wire</u>

2.    On  or  about  April  4,  2014,  at  or  near  Charleston,
Kanawha  County,  West  Virginia,  and  within  the  Southern  District
of  West  Virginia,  and  elsewhere,  having  devised  and  intending  to
devise   the   above-described   scheme   to   defraud,   and   for   the
purpose  of  executing  and  concealing  such  scheme  and  attempting
to  do  so,  defendant  GARY  L.  SOUTHERN  knowingly  filed  and  caused
to  be  filed  a  document  in  a  proceeding  under  title  11,  that  is,
a  notice  of  withdrawal  (the  "Notice")  of  his  Application  for  an
order.  The  Notice,  which  was  filed  in  the  United  States
Bankruptcy  Court  in  Freedom's  bankruptcy  case,  stated  that
SOUTHERN  was  withdrawing  the  Application  "to  try  to  .  .  .  end
the  unfounded  allegations  and  ceaseless  vilification  of  him  for
an  incident  that  occurred  a  mere  6  working  days  after  he  became
the  President  of  the  Debtor,  for  which  he  bears  no  fault.  .  .  ."

In  violation  of  Title  18,  United  States  Code,  Sections
157(2) and 2.

COUNT ELEVEN
(False Oath and Account in Bankruptcy Case)

1.    The Grand Jury re-alleges and incorporates by reference
paragraphs 1 through 27 of Count Four of this Indictment as if
fully set forth herein.

2.    On January 21, 2014, defendant GARY L. SOUTHERN
testified under oath in the first day hearing in Freedom's
bankruptcy case before the United States Bankruptcy Court for
the Southern District of West Virginia.

3.    In that hearing, SOUTHERN was questioned about whether
he worked for or was otherwise affiliated with Freedom before
Chemstream purchased Freedom on December 6, 2013.

4.    It was material to the hearing to determine who had been
responsible for the management, operations and record-keeping of
Freedom Industries in the years and months leading up to
Freedom's filing for bankruptcy protection on January 17, 2014.
It was further material to the hearing to determine who should
be entrusted with running Freedom, managing its day-to-day
operations, and preparing and maintaining financial records for
Freedom, as its bankruptcy case proceeded.

5.    On or about January 21, 2014, at or near Charleston,
Kanawha County, West Virginia, and within the Southern District
of West Virginia, during the first day hearing, defendant GARY

27

L. SOUTHERN did knowingly and fraudulently make a materially false oath and account, in and in relation to a case under Title 11, United States Code, as follows:

> Q [Attorney]: You didn't work for Freedom before the purchase by Chemstream, correct?

> A [SOUTHERN]: **I did not work for Freedom, no.**

> \* \* \* \* \*

> Q [The Court]: Before you step down, let me ask -- I understand your testimony to be that you have only recently come to this business, Freedom Industries, as its --

> A [SOUTHERN]: President.

> Q: -- president. And when did you accept that responsibility? When did you sign on?

> A: Well, Freedom didn't exist as an entity as it exists today until the 31st of December.

> Q: And that's when you signed on?

> A: Yes, sir.

> Q: What I don't understand is what capacity, if any, did you have with the companies that were commingled or merged into Freedom?

> A: You mean -- at what point?

> Q: Well, did you have any capacity prior to December 31st, 2013, with any of the companies?

> A: Yes.

> Q: You did?

> A: Prior to that -- that's a great question. **Prior to then, I worked as a part-time, financial type**

**consultant to help the owners of that business get their finances and systems kind of back on track.** Which is why I have a relatively detailed knowledge of the business.

Q:   The owners of what?

A:   The previous owners of Freedom -- the previous owners of Freedom Industries.

Q:   You were working with the seller shareholders --

A:   **I was previously consulting for the seller shareholders** in Freedom Industries and Etowah River Terminal, which were two entities.

Q:   That was your -- and how many months, if you can estimate, if you recall, were you working in that capacity?

A:   **Oh, probably three years maybe.**

Q:   That long?

A:   Uh-huh.

6.   In fact, the highlighted segments of SOUTHERN's material testimony were false, as SOUTHERN then and there well knew. SOUTHERN did work for Freedom, and not as a "part-time, financial-type consultant," before Freedom was purchased by Chemstream on or about December 6, 2013, and before SOUTHERN became Freedom's president in late-December 2013. Beginning in approximately May 2009, SOUTHERN worked for Freedom as its Chief Operating Officer. As the Chief Operating Officer, SOUTHERN managed Freedom's business affairs and operations at the Etowah Facility and the Poca Facility, exercised authority in hiring

29

employees and executing contracts, authorized spending, presided over staff meetings, and supervised employees, among other things. Also, SOUTHERN served on Freedom's board of directors from March 2010 until October 2013.

In violation of Title 18, United States Code, Section 152(2).

## COUNT TWELVE
### (False Oath and Account in Bankruptcy Case)

1.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of Count Four of this Indictment as if fully set forth herein.

2.    On February 25, 2014, defendant GARY L. SOUTHERN testified under oath in the meeting of creditors in Freedom's bankruptcy case.

3.    It was material to the meeting of creditors to review Freedom's assets and liabilities. It was further material to explore matters that might affect those assets and liabilities, including whether there were any potential claims that could be brought on behalf of Freedom, or Freedom's creditors, and to have full information about the interests and motivations of those individuals who managed and operated Freedom in the years and months leading up to Freedom's filing for bankruptcy protection on January 17, 2014, insofar as that information may have affected determinations about the assets available to Freedom's creditors.

4.    On or about February 25, 2014, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, during the meeting of creditors, defendant GARY L. SOUTHERN did knowingly and fraudulently make a

31

materially false oath and account in and in relation to a case under Title 11, United States Code, as follows:

Q [Attorney]:   All right. And that purchase of equity interest involved what entities, Mr. Southern?

A [SOUTHERN]:   Freedom Industries, Poca Blending and Crete Technologies and Etowah River Company.

Q:   And it's my understanding that all those entities, approximately on December 31st of 2013, were merged into our current entity, Freedom Industries?

A:   That is correct.

Q:   All right. Now -- so I can understand, as a basic outline of the schedules, while these entities were merged, they obviously were separate entities prior to the transaction on December 6th, as I understand it?

A:   Uh-huh.

Q:   And, in fact, they had different varied responsibilities or activities, would that be fair to say?

A:   Yes.

Q:   Okay. And what I'm going to try to do is, perhaps, go through each entity. And if you could, give me a basic description of what activities they, in fact, did prior to the acquisition would be helpful.

A:   **Prior to the acquisition by Chemstream, I was not part of the Freedom organization.** I'm happy to speak to what my understanding of the entities are, or [another witness] can speak to it. If you care for me to do it, I'm fine.

32

5.    In   fact,   the   highlighted   segment   of   SOUTHERN's
material   testimony   was   false,   as   SOUTHERN   then   and   there   well
knew.   SOUTHERN   was   "part   of   the   Freedom   organization"   before
Freedom   was   purchased   by   Chemstream   on   or   about   December   6,
2013.   Beginning   in   approximately   May   2009,   SOUTHERN   worked   for
Freedom   as   its   Chief   Operating   Officer.   As   the   Chief   Operating
Officer,   SOUTHERN   managed   Freedom's   business   affairs   and
operations   at   the   Etowah   Facility   and   the   Poca   Facility,
exercised   authority   in   hiring   employees   and   executing   contracts,
authorized   spending,   presided   over   staff   meetings,   and
supervised   employees,   among   other   things.   Also,   SOUTHERN   served
on   Freedom's   board   of   directors   from   March   2010   until   October
2013.

In   violation   of   Title   18,   United   States   Code,   Section
152(2).

## COUNT THIRTEEN
### (False Oath and Account in Bankruptcy Case)

1.　The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of Count Four of this Indictment as if fully set forth herein.

2.　On February 25, 2014, defendant GARY L. SOUTHERN testified under oath in the meeting of creditors in Freedom's bankruptcy case.

3.　It was material to the meeting of creditors to review Freedom's assets and liabilities. It was further material to explore matters that might affect those assets and liabilities, including whether there were any potential claims that could be brought on behalf of Freedom, or Freedom's creditors, and to have full information about the interests and motivations of those individuals who managed and operated Freedom in years and months leading up to Freedom's filing for bankruptcy protection on January 17, 2014, insofar as that information may have affected determinations about the assets available to Freedom's creditors.

4.　On or about February 25, 2014, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, during the meeting of creditors, defendant GARY L. SOUTHERN did knowingly and fraudulently make a

34

materially false oath and account in and in relation to a case
under Title 11, United States Code, as follows:

> Q [Attorney]:   Mr. Southern, you said that you were a
> consultant through another company for Freedom,
> since, what, 2009?

> A [SOUTHERN]:   Approximately, yes.

> Q:   I had a hard time understanding. What was the name of
> that company?

> A:   Blackwater.

> Q:   And is that a company owned by you?

> A:   No.

> Q:   Do you have any -- were you just an employee of that
> company?

> A:   **Yes.**

5.   In fact, the highlighted segment of SOUTHERN's
material testimony was false, as SOUTHERN then and there well
knew. SOUTHERN was not "just an employee" of "Blackwater," but
was the investment trustee and sole beneficiary of Southern
Investment Trust, which, in turn, was the sole owner of
Blackwater Group LLC ("Blackwater"), the company through which
Freedom paid SOUTHERN. In fact, SOUTHERN managed and controlled
Blackwater and did not report or otherwise treat himself as an
employee of Blackwater.

In violation of Title 18, United States Code, Section
152(2).

FORFEITURE FOR WIRE FRAUD AND
FALSE OATH AND ACCOUNT IN BANKRUPTCY
(18 U.S.C. §§ 1343 and 152(2))

In accordance with 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Fed R. Crim. P. 32.2(a), and premised upon the conviction of defendant GARY L. SOUTHERN of one or more violations of 18 U.S.C. §§ 1343, and 152(2) as set forth in Counts Nine, Eleven, Twelve, and Thirteen of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived, directly or indirectly, from proceeds traceable to such violation, including, but not limited to, the following:

1.   Gary Southern Annuity account xxxxxx8620, Jackson National Life Insurance Company; balance of $6,483,884.24 as of 9/30/2014;

2.   IWL Inc. Defined Benefit Plan, Brokerage account xxx-xx0473, Transamerica Financial Advisors, Inc.; balance of $169,618.38 as of 10/31/2014;

3.   IRA Rollover FBO Gary Southern account xxxxxx200N, US Bank C/F Curian Clearing LLC; balance of $373,006.65 as of 10/31/2014;

4.   IWL Inc. Account xxxxxx900Z, Curian Clearing LLC; balance of $165,138.85 as of 10/31/2014;

36

5.    IWL, Inc. 401(k) Profit Sharing Plan, contract number xxxxx1-000, Plan ID #x0648; balance of $237,871.53 as of 11/25/2014;

6.    Wells Fargo Advisors LLC, Gary Southern account xxxx0529; balance of $516,208.35 as of 11/30/2014;

7.    2012 Bentley Industries 2-door passenger vehicle, VIN SCBFR7ZA6CC073223; and

8.    Real property having a street address of 713 E. Hideaway Circle, Marco Island, Collier County, Florida  34145, being Lot 18, block 17, Hideaway Beach, as recorded in Plat Book 12, pages 80 through 85, Public Records of Collier County, Florida.

UNITED STATES OF AMERICA
R. BOOTH GOODWIN II


By:    _____
       PHILIP H. WRIGHT
       Assistant United States Attorney


       _____
       LARRY R. ELLIS
       Assistant United States Attorney


       _____
       ERIC P. BACAJ
       Assistant United States Attorney


37